**Slip Op. 23-183**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HYUNDAI STEEL COMPANY,** | |
| **Plaintiff,** | |
| **and** | |
| **AJU BESTEEL CO., LTD., NEXTEEL CO., LTD., and HUSTEEL CO., LTD.,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **HUSTEEL CO., LTD., NEXTEEL CO., LTD., and SEAH STEEL CORPORATION,** | **Before:  Jennifer Choe-Groves, Judge** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 22-00138** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **VALLOUREC STAR, L.P., WELDED TUBE USA INC., and UNITED STATES STEEL CORPORATION,** | |
| **Defendant-Intervenors.** | |

# OPINION

[Sustaining the U.S. Department of Commerce's remand results in the 2019–2020 administrative review of the antidumping duty order on certain oil country tubular goods from the Republic of Korea.]

Dated:  December 18, 2023

Jarrod M. Goldfeder and Robert G. Gosselink, Trade Pacific PLLC, of Washington, D.C., for Plaintiff Hyundai Steel Company and Consolidated Plaintiff AJU Besteel Co., Ltd.

J. David Park, Henry D. Almond, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Consolidated Plaintiff and Plaintiff-Intervenor NEXTEEL Co., Ltd.

Claudia Burke, Deputy Director, and Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was Jared M. Cynamon, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Choe-Groves, Judge:  Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai Steel") filed this action challenging the final results in the 2019–2020 administrative review of the antidumping duty order on certain oil country tubular goods ("OCTG") from the Republic of Korea ("Korea").  Summons, ECF No. 1; Compl., ECF No. 8; see Certain Oil Country Tubular Goods From the Republic of Korea ("Final Results"), 87 Fed. Reg. 20,815 (Dep't of Commerce Apr. 8, 2022) (final results of antidumping duty administrative

review and final determination of no shipments; 2019–2020), and accompanying

Issues and Decisions Memorandum ("Final IDM"), ECF No. 41-5.

   The Court remanded the case to Commerce in Hyundai Steel Co. v.

United States ("Hyundai Steel"), 47 CIT __, 639 F. Supp. 3d 1325 (2023).  Now

before the Court are the Final Results of Redetermination Pursuant to Court

Remand from the U.S. Department of Commerce ("Commerce").  See Final

Results of Redetermination Pursuant to Court Remand, ECF No. 78-1 ("Remand

Results").  For the following reasons, the Court sustains the Remand Results.

## ISSUES PRESENTED

   The Court reviews the following issues:

1. Whether Commerce's calculation of Hyundai Steel's constructed export price profit is supported by substantial evidence;

2. Whether Commerce's calculation of Hyundai Steel's constructed value profit and selling expenses is supported by substantial evidence;

3. Whether Commerce's calculation of Hyundai Steel's constructed value profit cap is supported by substantial evidence; and

4. Whether Commerce's dumping margin determination for non-examined respondents is supported by substantial evidence.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and reiterates facts relevant to review of the Remand Results. See Hyundai Steel, 47 CIT at __, 639 F. Supp. 3d at 1330–31.

In Hyundai Steel, the Court sustained: (1) Commerce's use of proprietary third-country sales information pertaining to SeAH Steel Corporation ("SeAH") in calculations related to Hyundai Steel; (2) Commerce's adjustments of reported general and administrative expenses of Hyundai Steel and its U.S. affiliate, Hyundai Steel USA, Inc.; and (3) Commerce's application of neutral facts available to adjust Hyundai Steel's reported further manufacturing costs to account for yield loss; and remanded: (4) the calculation of Hyundai Steel's constructed export price profit (for which Commerce requested a voluntary remand); (5) the calculation of Hyundai Steel's constructed value profit and selling expenses; and (6) the calculation of Hyundai Steel's constructed value profit cap. Hyundai Steel, 47 CIT at __, 639 F. Supp. 3d at 1332–39. Specifically, the Court remanded Commerce's determination of the constructed export price profit to allow Commerce to reconsider a potential misunderstanding of evidence on the administrative record that had relied on third-country data of SeAH's OCTG sales to Kuwait. Id. at __, 639 F. Supp. 3d at 1334. The Court also concluded that the Final Results had not foreclosed the claims of NEXTEEL Co. ("NEXTEEL")

based only on Defendant's counterclaim of technicality (i.e., exhaustion of administrative remedies).  Id. at __, 639 F. Supp. 3d at 1339.  Commerce was also directed to reconsider the separate rates calculated for non-examined companies if Plaintiff's weighted-average dumping margin was changed on remand.  Id. at __, 639 F. Supp. 3d at 1337–38.

Commerce filed its Remand Results on August 15, 2023, revising its methodology of calculation of constructed export price profit to rely on Hyundai Steel's actual sales data.  Remand Results at 7–10.  Commerce continued to use SeAH's third-country market sales to Kuwait in calculating the constructed value profit and selling expenses and the constructed value profit cap.  Id. at 10–19.

Hyundai Steel filed its Comments in Partial Opposition to Commerce's Remand Redetermination and Comments in Partial Support of Commerce's Remand Redetermination.  Cmts. Pl. Part. Opp'n Remand Redetermination ("Pl.'s Opp'n Cmts."), ECF No. 81; Cmts. Pl. Part. Supp. Remand Redetermination, ECF No. 86.  NEXTEEL filed its Comments in Partial Opposition to the Remand Results and Comments in Partial Support of Remand Results.  Cmts. Consol. Pl. Pl.-Interv. NEXTEEL Part. Opp'n Remand Results ("NEXTEEL's Opp'n Cmts."), ECF No. 80; Cmts. Consol. Pl. Pl.-Interv. NEXTEEL Part. Supp. Remand Results, ECF No. 84.  Consolidated Plaintiff AJU Besteel Co., Ltd. ("AJU Besteel") filed its Comments in Partial Opposition to Commerce's Remand Redetermination.

Cmts. Consol. Pl. AJU Besteel Part. Opp'n Remand Redetermination ("AJU

Besteel's Opp'n Cmts."), ECF No. 82.  Defendant United States ("Defendant")

filed Defendant's Response in Support of Remand Results.  Def.'s Resp. Supp.

Remand Results ("Def.'s Resp."), ECF No. 85.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final results of an administrative review of an antidumping duty order.  The Court

will hold unlawful any determination found to be unsupported by substantial

record evidence or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  The Court reviews determinations made on remand for

compliance with the Court's remand order.  Ad Hoc Shrimp Trade Action Comm.

v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802

F.3d 1339 (Fed. Cir. 2015).

## STATUTORY FRAMEWORK

Commerce imposes antidumping duties on foreign goods if "(1) it

determines that the merchandise 'is being, or is likely to be, sold in the United

States at less than its fair value,' and (2) the International Trade Commission

determines that the sale of the merchandise at less than fair value materially

injures, threatens, or impedes the establishment of an industry in the United

States." <u>Diamond Sawblades Mfrs. Coal. v. United States</u>, 866 F.3d 1304, 1306

(Fed. Cir. 2017) (quoting 19 U.S.C. § 1673(1)).  Antidumping duties are calculated

as the difference between the normal value of subject merchandise and the export

price or the constructed export price of the subject merchandise.  <u>See</u> 19 U.S.C.

§ 1673.

        Normal value is ordinarily determined using the sales price of the subject

merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If

Commerce determines that normal value cannot be calculated reliably using home

market or third-country sales, Commerce may use the subject merchandise's

constructed value as an alternative to normal value.  <u>Id.</u> § 1677b(a)(4).  The

method for calculating constructed value is defined by statute.  <u>Id.</u> § 1677b(e).

When calculating constructed value, Commerce must utilize the respondent's

actual selling, general, and administrative expenses, and profits in the respondent's

home market or a third-country market, if possible.  <u>See id.</u> § 1677b(e)(2)(A).  If

Commerce cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review

(other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise[.]

Id. § 1677b(e)(2)(B).

Commerce must also calculate the export price or constructed export price of subject merchandise.  Relevant here is constructed export price, which is:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, [subject to certain adjustments].

Id. § 1677a(b).  The price used to calculate constructed export price is reduced by commissions, selling expenses, further manufacturing expenses, and the profit allocated to incurred expenses.  Id. § 1677a(d).  Those profits are "an amount determined by multiplying the total actual profit by the applicable percentage."  Id. § 1677a(f)(1).

## DISCUSSION

### I.   Constructed Export Price Profit Methodology

Commerce based its margin calculations for Hyundai Steel on constructed

export price.  Final IDM at 5.  When calculating constructed export price, the

profits to be allocated to incurred expenses are "an amount determined by

multiplying the total actual profit by the applicable percentage."  19 U.S.C.

§ 1677a(f)(1).  In that calculation, Commerce "may rely on any appropriate

financial reports, including public, audited financial statements, or equivalent

financial reports, and internal financial reports prepared in the ordinary course of

business."  19 C.F.R. § 351.402(d)(2).  The "applicable percentage" is "the

percentage determined by dividing the total United States expenses by the total

expenses."  19 U.S.C. § 1677a(f)(2)(A).  The statute defines "total expenses" and

"total actual profit" as follows:

> (C)    Total expenses
>
> The term "total expenses" means all expenses in the first of the
> following categories [that] applies and which are incurred by or on
> behalf of the foreign producer and foreign exporter of the subject
> merchandise and by or on behalf of the United States seller affiliated
> with the producer or exporter with respect to the production and sale of
> such merchandise:
>
> > (i)    The expenses incurred with respect to the subject
> > merchandise sold in the United States and the foreign like
> > product sold in the exporting country if such expenses
> > were requested by the administering authority for the

> purpose of establishing normal value and constructed
> export price.
>
> (ii)    The expenses incurred with respect to the narrowest
>         category of merchandise sold in the United States and the
>         exporting  country  which  includes  the  subject
>         merchandise.
>
> (iii)   The expenses incurred with respect to the narrowest
>         category of merchandise sold in all countries which
>         includes the subject merchandise.
>
> (D)     Total actual profit
>
> The term "total actual profit" means the total profit earned by the
> foreign producer, exporter, and affiliated parties described in
> subparagraph (C) with respect to the sale of the same merchandise for
> which total expenses are determined under such subparagraph.

Id. § 1677a(f)(2)(C)–(D).

During the administrative review, Plaintiff proposed six options to

Commerce for calculating Hyundai Steel's constructed export profit ratio:

> Option 1:   Hyundai Steel's actual OCTG pipe profit ratio
>             during the period of review, based on the
>             information in Hyundai Steel's sales and cost
>             reconciliations in this administrative review.
>
> Option 2:   Hyundai Steel's overall profit for all steel-related
>             sales and activities.
>
> Option 3:   The overall profit of Hyundai Steel USA for all
>             steel-related sales and activities.

Option 4:     The actual U.S. sales data reported in Hyundai Steel's most recently submitted U.S. sales and cost of production files.

Option 5:     An average of various surrogate pipe producers from other countries.

Option 6:     SeAH's overall profit for its steel operations, averaged for the two-year period.

Remand Results at 3–4 (citing Pl.'s Admin. Case Br. (Nov. 9, 2021) at 31–32, PR 281).[1]  In the Final Results, Commerce rejected each of the proposed options and calculated Plaintiff's constructed export price profit by relying instead on SeAH's third-country OCTG sales experience in Kuwait during the period of review based on Commerce's conclusion that these were all constructed export price sales.  Final IDM at 44–47.

On appeal at the U.S. Court of International Trade, Defendant requested a remand of the constructed export price profit determination to allow Commerce to reconsider a potential misunderstanding of evidence on the administrative record. Def.'s Resp. Opp'n Mot. J. Admin. R. at 32–34, ECF No. 60.  The Court granted the request and remanded the issue to Commerce.  Hyundai Steel, 47 CIT at __, 639 F. Supp. 3d at 1334–35.

---

[1]  Citations to the administrative record reflect the public record ("PR") and public remand record ("PRR") numbers filed in this case, ECF Nos. 68, 88.

On remand, Commerce determined that its previous rejection of Hyundai

Steel's proposed options for calculating constructed export price profit and reliance

on SeAH's Kuwait sales data were based on a misunderstanding of the

administrative record.  Remand Results at 7.  Upon reconsideration, Commerce

determined that SeAH's Kuwait sales did not reflect constructed export price sales

in fact, and Commerce reversed the determination to use those sales as the source

for calculating the constructed export price profit ratio and reconsidered the six

options proposed by Hyundai Steel.  Id.  Commerce redetermined that Hyundai

Steel's options 1, 2, 3, and 4 represented Hyundai Steel's actual profit, option 5

represented profit from surrogate price producers, and option 6 represented profits

from SeAH.  Id. at 8.  Commerce stated that its interpretation of 19 U.S.C.

§ 1677a(f)(2)(C) and (D) created a preference for calculating the constructed

export price profit ratio based on the expenses and profits of the "foreign producer,

exporter, and affiliated parties."  Id.  Based on this reading of the statute,

Commerce focused its analysis on whether Hyundai Steel's proposed options 1–4,

which were specific to Hyundai Steel's actual profits, fell within the three

alternatives under 19 U.S.C. § 1677a(f)(2)(C).  Id. at 8–9.

Subsection 1677a(f)(2)(C)(i) of Title 19 covers: "[t]he expenses incurred

with respect to the subject merchandise sold in the United States and the foreign

like product sold in the exporting country if such expenses were requested by the

administering authority for the purpose of establishing normal value and constructed export price." 19 U.S.C. § 1677a(f)(2)(C)(i).  Commerce determined that none of the proposed options 1–4 fell under this category.  Remand Results at 9.  Commerce next considered alternative (ii), which covers: "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise."  Id.; 19 U.S.C. § 1677a(f)(2)(C)(ii).  Commerce determined that options 1–4 did not fit into alternative (ii).  Remand Results at 9.  Lastly, Commerce considered alternative (iii), which covers, "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise."  Id. at 9–10; 19 U.S.C. § 1677a(f)(2)(C)(iii).  After reconsideration, Commerce determined that option 2 represented Hyundai Steel's actual profits and fit within alternative (iii), recalculating Hyundai Steel's dumping margin based on Hyundai Steel's overall profit for all steel-related sales and activities.  Remand Results at 10.

No party objects to Commerce's revised constructed export price profit methodology.  NEXTEEL's Cmts. Part. Supp. at 2–3; see also NEXTEEL's Cmts. Part. Opp'n; Pl.'s Cmts. Part. Opp'n; AJU BESTEEL's Cmts. Part. Opp'n.  The Court sustains this determination accordingly.

## II.    Constructed Value Profit and Selling Expenses

In the underlying administrative review, Commerce calculated Hyundai

Steel's constructed value profit and selling expenses by using SeAH's combined

constructed value profit and selling expenses for third-country market sales.  Final

IDM at 37.  Because Hyundai Steel did not have viable home or third-country

markets during the period of review to serve as a basis for normal value,

Commerce based normal value on constructed value in accordance with 19 U.S.C.

§ 1677b(a)(4).  Id. at 37.  As a further result, Commerce could not calculate

constructed value profit and selling expenses based on the respondent's own home

market or third-country sales made in the ordinary course of trade, which is the

preferred method under 19 U.S.C. § 1677b(e)(2)(A).  Id. at 37–38.

For the calculation of Hyundai Steel's constructed value profit and selling

expenses, interested parties placed numerous alternative sources on the record:

> Alternative 1:  Financial statements for the first three quarters of 2020
> and the audited 2019 financial statements of Borusan
> Mannesmann Boru Sanayi ve Ticaret A.S.
> ("Borusan");
>
> Alternative 2:  Financial statements for the first three quarters of 2020
> and the audited 2019 financial statements of Chung
> Hung Steel Corp. ("Chung Hung");
>
> Alternative 3:  Audited 2020 financial statements of Nippon Steel
> Corporation ("Nippon Steel");

Alternative 4:  Audited 2020 and 2019 financial statements of PAO
TMK ("TMK");

Alternative 5:  Financial statements for SeAH's third-country period
of review sales of OCTG;

Alternative 6:  Audited 2020 and 2019 financial statements of Tenaris
S.A. ("Tenaris");

Alternative 7:  Audited 2020 financial statements of Welspun Corp.
Limited ("Welspun").

See id. at 39.

Commerce determined that, in contrast to the alternative data sources

submitted by interested parties, the combined constructed value profit and selling

expenses for SeAH's third-country market sales of OCTG during the period of

review represented the best source for valuing Hyundai Steel's constructed value

profit and selling expenses because they reflected the profit and selling expenses of

a Korean OCTG producer, were based on OCTG sales to a viable comparison

market, and were derived from sales made in the ordinary course of trade.  Id. at

40–41.

On remand, Commerce continued to adhere to this determination.  Remand

Results at 10–16, 21–32; see Final IDM at 37–41.

Plaintiff, NEXTEEL, and AJU Besteel contend that Commerce: (1) misread

the statute concerning constructed value profit and selling expenses; (2) relied

unreasonably on SeAH Steel's third-country sales data to calculate constructed

value profit and selling expenses for Hyundai Steel; and (3) placed inappropriate weight on the U.S. Court of Appeals for the Federal Circuit's ("CAFC") affirmance of a substantially identical approach in a recent case to support its determination.  See Pl.'s Opp'n Cmts at 2–13; NEXTEEL's Opp'n Cmts. at 1–2; AJU Besteel's Opp'n Cmts. at 1–2; see also NEXTEEL Co., Ltd. v. United States ("NEXTEEL II"), 28 F.4th 1226, 1240–41 (Fed. Cir. 2022).  Defendant argues that Commerce's determination is reasonable and supported by substantial evidence. Def.'s Resp. at 8–15.

The statute directs Commerce to utilize the respondent's actual selling, general, and administrative expenses and profits from the home market or a third-country market when calculating constructed value for a respondent.  SeAH Steel Corp. v. United States, 45 CIT __, __, 513 F. Supp. 3d 1367, 1378 (2021) (citing 19 U.S.C. § 1677b(e)(2)(A)).  If those data are unavailable, however, then the statute provides three alternative methodologies.  See 19 U.S.C. § 1677b(e)(2)(B). The first alternative permits evaluation of the data associated with the respondent company's other products "in the same general category of products as the subject merchandise."  Mid Continent Steel & Wire, Inc. v. United States ("Mid Continent"), 941 F.3d 530, 535 (Fed. Cir. 2019) (quoting 19 U.S.C. § 1677b(e)(2)(B)(i)).  The second alternative permits evaluation of the data of other respondents to the investigation.  See id. (citing 19 U.S.C.

§ 1677b(e)(2)(B)(ii)).  "The third allows Commerce to use 'any other reasonable method,'" subject to a profit cap.  See id. (citing 19 U.S.C. § 1677b(e)(2)(B)(iii)).

Towards a determination on constructed value profit, "[t]he objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price of the particular merchandise."  SeAH Steel Corp., 45 CIT at __, 513 F. Supp. 3d at 1396 (citing Mid Continent, 941 F.3d at 542).

Hyundai Steel had no viable home market or third-country market, and the record lacked evidence of actual amounts incurred or realized by Hyundai Steel for profits in connection with production and sale of a foreign like product in the ordinary course of trade in Korea.  Remand Results at 11; Final IDM at 37.  As a result, Commerce was unable to calculate the constructed value profit and selling expenses pursuant to 19 U.S.C. § 1677b(e)(2)(A) (i.e., the preferred method), resulting in Commerce considering the alternatives provided in 19 U.S.C. § 1677b(e)(2)(B).  Remand Results at 11.

The statute does not provide a hierarchy for selecting among the alternatives. The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act provides that "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."  See Uruguay

Round Agreements, Statement of Administrative Action, H.R. Doc. No. 103-316,

vol. 1, at 840 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4176.

Commerce weighed the value of the available data on the record and

determined that it was appropriate to calculate constructed value profit and selling

expenses in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii) (i.e., using any other

reasonable method). Remand Results at 12–13. Commerce determined that the

combined constructed value profit and selling expenses for SeAH's third-country

market sales of OCTG during the period of review was the best information on the

record. See id. at 14. Commerce determined that "SeAH's combined selling

expense and profit experience reflects the profit of a Korean OCTG producer, on

comparison market sales of the merchandise under consideration, in the ordinary

course of trade." Id. Therefore, Commerce determined that SeAH's profit was

both specific to OCTG and production within Korea. Id.

In contrast, Commerce determined that the alternative profit information on

the record (specifically, the financial statements for Borusan, Chung Hung, Nippon

Steel, TMK, Tenaris, and Welspun) were less specific to OCTG (or even to

products in the same general category as OCTG), did not reflect the production

experience of an OCTG producer in Korea, and in some instances were not

contemporaneous with the period of review. Id. at 15. Thus, Commerce relied on

SeAH's third-country market sales of OCTG during the period of review because it

found that this source most closely approximated the statutory preference for

profits "in connection with the production and sale of a foreign like product, in the

ordinary course of trade, for consumption in the foreign country." See id.; see also

19 U.S.C. § 1677b(e)(2)(A).

Plaintiff first argues that Commerce misread the statute concerning

constructed value profit and selling expenses "[b]ecause 19 U.S.C.

§ 1677b(e)(2)(B) contains no language setting forth a preference that the profit and

selling expenses must reflect the foreign like product . . . over other merchandise

within the same general category of merchandise as subject merchandise." Pl.'s

Opp'n Cmts. at 6. Plaintiff submits that "Commerce unreasonably assigned a legal

preference for SeAH Steel's third-country sales of foreign like product as the basis

for [constructed value] profit instead of the alternate financial data of products

within the same general category as OCTG." Id.

The Court considers that Commerce's analysis of the relevant statutes

proceeded along the following lines. Initially, 19 U.S.C. §§ 1677b(e)(2)(A) and

(B) expressly reference "foreign like product." See Remand Results at 24. Both

19 U.S.C. §§ 1677b(e)(2)(B)(i) and 19 U.S.C. § 1677b(e)(2)(B)(iii) reference

profit in connection with "merchandise that is in the same general category of

products as the subject merchandise." See id. Further, 19 U.S.C. § 1677(16)

defines the term "foreign like product" to include *"[t]he subject merchandise and*

other merchandise, which is identical in physical characteristics with, and was

produced in the same country by the same person as, that merchandise." See id.

(citing 19 U.S.C. § 1677(16) (emphasis added)).  Although the statute "recognizes

that Commerce has imperfect information on the record in situations where

[Commerce] must resort to alternative methods, affording some flexibility to the

agency . . . , this does not mean that there is no preference in the statute." Id.  To

the contrary, "the statute has a preference for profit sources in the [constructed

value] profit calculation reasonably approximating the profit connected to the

production and sale of the merchandise under consideration (as opposed to

dissimilar products) in a foreign country because it increases the accuracy of that

calculation." Id.

　　　　Commerce's interpretation of the statute is not unreasonable.  This Court has

previously acknowledged that the "statute indicates a preference in calculating

[constructed value] profit for data sources reflecting production and sales in the

foreign country of the foreign like product." See Husteel Co. v. United States

("Husteel II"), 40 CIT __, __, 180 F. Supp. 3d 1330, 1346 (2016).  In addition, this

Court has sustained a similar methodological approach in other recent cases.  See

SeAH Steel Corp., 45 CIT at __, 513 F. Supp. 3d at 1397; Bldg. Sys. de Mexico v.

United States, 46 CIT __, __, 609 F. Supp. 3d 1369, 1374–76 (2022); see also

Remand Results at 16.

In applying "any other reasonable method" pursuant to 19 U.S.C.

§ 1677b(e)(2)(B)(iii), Commerce considered the degree to which each profit source

reflected production and sales in the relevant foreign country of Korea, and the

merchandise under consideration. Remand Results at 15. Commerce considered

the financial statements on the record for Borusan, Chung Hung, Nippon Steel,

TMK, Tenaris, and Welspun. Id. Commerce considered that each was less

specific to the product under consideration (i.e., OCTG) and none represented the

production experience or profit from production in Korea. See id. 25–26; Final

IDM at 39–40. Commerce found repeatedly that SeAH's third-country sales of

OCTG were the best choice among various profit sources on the record. Draft

Remand Results at 10–16, PRR 1; Remand Results at 22–32; see also Final IDM at

37–41.

SeAH's profit reflected Korean production of OCTG, which Commerce

determined could reasonably be used as a constructed value profit source for

determining the profitability of OCTG sales of Hyundai Steel, another Korean

producer. Remand Results at 26. Commerce determined that SeAH's third-

country OCTG sales reflected production of OCTG in Korea, and SeAH's data

provided the greatest specificity to the merchandise under consideration. Id.

Commerce emphasized that OCTG are specialized and high value products, and

the alternative profit sources included, at least in part, profit from non-comparable

products that were not in the same general category of products as subject merchandise.  Id.[2]  Thus, profit from these alternative sources would have been derived from a mixture of various products that included products that were outside the general category of merchandise with subject OCTG, whereas SeAH's third-country sales profit did not include such products and provided the greatest specificity with regard to the product under consideration.  Id. at 26–27.  For these reasons, the Court concludes that Commerce's determination that SeAH's third-country profit and selling expenses was the best information available is reasonable.

Plaintiff next claims that Commerce's decision to rely on SeAH's third-country sales data was unreasonable and unrepresentative for calculating constructed value profit and selling expenses for Hyundai Steel.  See Pl.'s Opp'n Cmts. at 6–11.  Specifically, Plaintiff argues that Commerce did not address certain arguments regarding the model mix of OCTG sold by SeAH and Hyundai Steel or any deficiencies with the SeAH dataset.  Id.  It appears from the record, however,

---

[2]  See also Husteel II, 40 CIT at __, 180 F. Supp. 3d at 1341–42 ("Commerce's interpretation of same general category of products in this case as excluding non-OCTG products is reasonable. . . .  Commerce explained that it was reasonable to expect differences in the industry to reflect differences in the product based on the various applications and uses of the products in each respective industry.  Because of the significant differences in the industries, Commerce's conclusion that non-OCTG pipe is not in the same general category of products as OCTG was not unreasonable or unsupported.").

that Commerce examined all potential sources of constructed profit and selected the source that best reflected the statutory preferences.

Commerce determined that SeAH's dataset was the most specific and related to production in Korea compared to the alternative financial statements, which related to non-Korean producers, profit from products that were outside of the same general category of products, and were less contemporaneous with the period of review.  Remand Results at 30–31.  Commerce also determined that the alternative sources did not represent the production experience in Korea.  Id. at 30. Commerce explained further that it was not necessary to "dissect" differences among various models of OCTG when the alternative sources on the record incorporated profit from dissimilar products, such as "water pipe, line pipe, automotive pipe, structural pipe, various coils, etc."  Id. at 31 and n.112 (citing SeAH's Constructed Value Submission (Apr. 14, 2021) ("SeAH's Constructed Value Submission") at Att. 2-C ("TMK Product Information"), PR 139–144; Hyundai Steel's Letter, "Oil Country Tubular Goods from the Republic of Korea: Submission of Factual Information and Comments Concerning CV Profit and Selling Expenses (Apr. 14, 2021) ("Hyundai Steel Constructed Value Submission") at Ex. 1, PR 145–150).

In addition, Commerce observed that the "alternative sources of profit are company-wide financial statements that incorporate the profit at the aggregate

level" and therefore it was "impossible to determine the exact model mix for the

OCTG these companies sell or conclude that their model mix is a better fit with

Hyundai Steel's model mix." Id. at 31.[3]  Commerce observed that both SeAH's

third-country sales and Hyundai's U.S. sales related exclusively to welded pipe,

whereas the product catalogues of the alternative sources indicated the sale of

seamless pipe.  Remand Results at 32.[4]  Such observations are not indicia of

impropriety in relying on SeAH third-country sales data.

Finally, Plaintiff argues that "[t]he Court must reject Commerce's reliance

on other cases involving [constructed value] profit determinations because they

have no bearing on the factual record applicable to the current appeal involving

SeAH Steel's demonstrably unrepresentative sales to Kuwait."  See Pl.'s Opp'n

Cmts. at 11–13.  Relying on Mexichem Fluor Inc. v. United States, 40 CIT __, 179

F. Supp. 3d 1238 (2016), and Nucor Corp. v. United States, 414 F.3d 1331 (Fed.

---

[3]  See Def.'s Resp. at 13–14 (citing SeAH's Constructed Value Submission at Atts. 1-A–5-A; Hyundai Steel's Constructed Value Submission at Exs. 1–4; Petitioner's Letter, "Oil Country Tubular Goods from the Republic of Korea: Response to Request for Constructed Value Profit and Selling Expense Comments and Information" (Apr. 14, 2021) ("Petitioner's Constructed Value Submission") at Exs. 6 and 8, PR 153–154, 156).

[4]  See Def.'s Resp. at 14 (citing SeAH's Constructed Value Submission at Atts. 1-C ("Tenaris Product Information") and 2-C; see also Hyundai Steel's Constructed Value Submission at Ex. 3 at 73 ("Product Information: Seamless pipe pipes & tubes") and Ex. 4; Petitioner's Constructed Value Submission at Ex. 1 at 10–11).

Cir. 2005), Plaintiff argues that facts do not automatically transfer to another investigation, and any prior administrative determination is not legally binding on other reviews.  Id. at 12–13 (citing Mexichem Fluor Inc. v. United States, 40 CIT __, 179 F. Supp. 3d 1238, 1255 (2016); Nucor Corp. v. United States, 414 F.3d 1331, 1340 (Fed. Cir. 2005)).

Commerce must make a determination based on the record before it.  Prior administrative determinations may not be "legally" binding in future proceedings, but Commerce is obliged to act consistently.  See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").  However, neither "administrative stare decisis" nor consistent treatment are issues in this case.  Commerce weighed the available record evidence and evaluated that evidence against the applicable legal framework.  The fact that Commerce cited cases in which this Court and the CAFC sustained Commerce's analysis of similar factual and legal issues does not imply—as Plaintiff suggests—that Commerce "blindly" relied on those cases without further analysis.

Commerce reasonably explained the shortcomings of the alternative of profit data and provided extensive reasoning regarding the benefits of relying on SeAH's third-country sales of OCTG.  While Plaintiff would prefer its own methodology, Commerce presented substantial evidence and explained why reliance on the

SeAH data was reasonable under 19 U.S.C. § 1677b(e)(2)(B)(iii).  "[I]t is well-settled that the Court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views."  Coal. for Fair Trade in Hardwood Plywood v. United States, 46 CIT __, __, 610 F. Supp. 3d 1344, 1368 (2022) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  The Court concludes that Commerce's determination to rely on SeAH's third-country sales data was reasonable and supported by substantial evidence.

## III.   Constructed Value Profit Cap

In the underlying administrative review, Commerce calculated the constructed value profit based on the "any other reasonable method" pursuant to section 19 U.S.C. § 1677b(e)(2)(B)(iii).  Final IDM at 40.

When Commerce applies the "any other reasonable method" of alternative (iii), the "amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise" (i.e., the "profit cap").  19 U.S.C. § 1677b(e)(2)(B)(iii).  Neither Hyundai Steel nor SeAH provided evidence on the record to show profit that satisfied the requirements of the profit cap under the statute, i.e., profit generated from the sale of OCTG in Korea or products in the same general category as the

subject merchandise in Korea.  See Final IDM at 42.  Consequently, for the

underlying administrative review, Commerce determined the profit cap based on

"facts available" using the profit from SeAH's third-country sales of OCTG as the

best available information.  Final IDM at 42–43.  On remand, Commerce

reconsidered its determination and reached the same result.  Remand Results at 34–

40.

        Plaintiff argues that Commerce did not apply an appropriate profit cap in

this instance, "or rather, it used the source it selected as the profit cap.  This was

tantamount to applying no cap at all[.]"  Pl.'s Opp'n Cmts. at 14.  Plaintiff

contends that this determination was unreasonable.  Id. at 13–18.  Specifically,

Plaintiff asserts that the use of facts available was impermissible and that the use of

SeAH Steel's third-country sales was inconsistent compared to other record

sources.  Id.

        The reason for the profit cap is to prevent the various possible calculation

methods from yielding anomalous results that stray beyond the "amount normally

realized" from sales of merchandise in the same general category.  See Atar S.r.l.

v. United States, 730 F.3d 1320, 1327 (Fed. Cir. 2013); see also Mid Continent,

941 F.3d at 545.  Congress intended the profit cap to be "(1) based on home market

sales information of the same general category of products as the subject

merchandise, (2) non-aberrational to the industry under consideration, (i.e., 'the

amount normally realized'), and (3) not based on the data of the respondent." Mid

Continent, 941 F.3d at 545.  But "[w]hen Commerce determines that necessary

information is missing from the administrative record, it must rely on facts

otherwise available to fill in the gap in the record." Hyundai Steel, 47 CIT at __,

639 F. Supp. 3d at 1337 (citing 19 U.S.C. § 1677b(e)(a)).  In that situation, it "may

apply neutral facts available when information is absent from the administrative

record, regardless of the reason for the absence." Id.

In this instance, Commerce was "unable to calculate the amount realized by

exporters or producers in connection with the sale, for consumption in the foreign

country, of the merchandise in the same general category of products as the subject

merchandise" as required by 19 U.S.C. § 1677b(e)(2)(B)(iii). Remand Results at

5, 17.  Commerce therefore applied neutral facts available for the profit cap and

relied on SeAH's profit from sales in a third-country market. Id. "As facts

available, . . . they are specific to OCTG and reflect the production experience of a

Korean OCTG producer." Id. at 5–6; see also id. at 17–18.

The situation here is similar to that of NEXTEEL Co. v. United States

("NEXTEEL II"), 28 F.4th 1226 (Fed. Cir. 2022), in which Commerce was also

unable to calculate the profit cap pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii)

because no profit information for sales in Korea of OCTG or for products in the

same general category were on the record. See NEXTEEL II, 28 F.4th at 1240–41.

Commerce in that situation relied on facts available, and SeAH's sales were chosen because those sales were "specific to OCTG and represent the production experience of a Korean OCTG producer in Korea" and were therefore considered a reasonable choice for a profit cap.  Id. at 1241.  The CAFC sustained Commerce's approach, id., and the Remand Results reflect that Commerce's approach in this case is substantively the same.

In addition, the Court has previously sustained "Commerce's conclusion that non-OCTG pipe is not in the same general category of products as OCTG [as it] was not unreasonable or unsupported" in other cases.  See, e.g., Husteel II, 40 CIT at __, 180 F. Supp. 3d at 1342.  In the present case, Commerce determined that the SeAH third-country data met the constructed value profit requirements for use under the statutorily-preferred method and were not distorted by the production and sale of products not considered to be in the same general category of products as OCTG.  Remand Results at 19.  Commerce determined that SeAH's profit data from the sale of OCTG in its third-country market were the best data to be used as the "facts available" profit cap in calculations for Hyundai Steel because they were specific to OCTG and represented the production experience of a Korean OCTG producer in Korea.  Id.

Relying on Geum Poong Corp. v. United States ("Geum Poong"), 25 CIT 1089, 163 F. Supp. 2d 669 (2001), and Husteel Co. v. United States ("Husteel I"),

39 CIT __, 98 F. Supp. 3d 1315 (2015), Plaintiff argues that Commerce may not

apply facts available and that its use perpetuates irrational or unrepresentative

results.  See Pl.'s Opp'n Cmts. at 13–15 (citing Geum Poong, 25 CIT at 1097, 163

F. Supp. 2d at 679; Husteel I, 39 CIT at __, 98 F. Supp. 3d at 1348).  The Court in

Geum Poong stated that "Commerce is free to employ a reasonable approach" and

"Commerce must explain why it chose one methodology over another."  Geum

Poong, 25 CIT at 1097, 163 F. Supp. 2d at 679.  "Commerce cannot sidestep the

requirement without giving adequate explanation even in a facts available

scenario."  Id.  The Court concludes that Commerce has supplied an adequate

explanation in this case.

        In Husteel I, the court concluded that even if Commerce's determination that

there was no home market profit data for other exporters and producers in Korea of

the same general category of products was reasonable, "Commerce still was

required to attempt to apply a profit cap on the basis of the facts available."

Husteel I, 39 CIT at __, 98 F.Supp.3d at 1348.  The court reiterated this conclusion

on remand.  Husteel II, 40 CIT at __, 180 F. Supp. 3d at 1348.

        Plaintiff focuses on Husteel II's statement that "a non-cap is not a cap."

Pl.'s Opp'n Cmts. at 14–15 (quoting Husteel II, 40 CIT at __, 180 F. Supp. 3d at

1348).  However, the court still found that:

> Commerce's failure to cap the profit rate . . . was reasonable based on the record.  Commerce was faced with a difficult decision as all of the information on the record had imperfections, and the court is not persuaded that any of the 'caps' suggested by Respondents fulfill the statute any better than no cap.

Husteel II, 40 CIT at __, 180 F. Supp. 3d at 1348.  Furthermore, the Court has

opined that "[w]hen Commerce explains reasonably that information is not

available for Commerce to calculate a profit cap, Commerce may calculate

constructed profit under subsection (iii) without calculating a profit cap."  SeAH

Steel Corp. v. United States, 45 CIT __, __, 539 F. Supp. 3d 1341, 1362 (2021).

And "[t]he court normally defers to Commerce's selection of the best available

information when Commerce is forced to rely on facts available."  Husteel I, 39

CIT at __, 98 F. Supp. 3d at 1347 (referencing Allied-Signal Aerospace Co. v.

United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993)).

     In the Remand Results, Commerce determined that information to calculate

a profit cap under 19 U.S.C. § 1677b(e)(2)(B)(iii) was not available on the record.

See Remand Results at 17–19; Draft Remand Results at 16–18.  Commerce

calculated a profit cap based on facts available using SeAH's third-country sales as

the best available information.  Remand Results at 39.  Commerce also examined

"the alternative profit sources on the record (and reexamined them for both the

Final Results and this remand proceeding), concluding each time that SeAH's data

are the best available information for using as the profit cap."  Id.  Further,

Commerce reasonably explained that the selection of a facts available profit cap

based on profit from third-country sales of OCTG was a reasonable proxy for

profits normally realized by Korean exporters and producers from sales of

merchandise in the same category of merchandise as the subject merchandise,

which was in accordance with the CAFC's holding in NEXTEEL II.  See Remand

Results at 40; see also NEXTEEL II, 28 F.4th at 1241.  All of the alternative profit

sources on the record included sales of products that were outside the same general

category of merchandise.  Remand Results at 40.  Thus, the "SeAH data meet the

[constructed value] profit requirements for use with regard to SeAH under the

preferred method of the law and *are not distorted by the production and sale of*

*products not considered to be in the same general category of products as OCTG*."

Id. (emphasis in original).  The Court is not persuaded by Plaintiff's argument that

Commerce may not apply facts available to calculate the profit cap.

        Finally, Plaintiff contends that Commerce should not have relied on SeAH's

third-country sales, as "the goal in calculating [constructed value] profit is to

approximate the home market profit experience of the respondents."  See Pl.'s

Opp'n Cmts. 15–18.  Plaintiff's comparison of alternative profit sources to

demonstrate that SeAH's profit was abnormally high is not persuasive.  Commerce

determined that the alternative sources included, in part, profit from non-

comparable products that were outside of the same general category of products as

Consol. Court No. 22-00138                                                  Page 33

the subject merchandise.  Remand Results at 37.  Commerce explained that

comparing sales of "Korean-made OCTG to profit that is derived, in part, from

sales of such dissimilar products as Russian power generation pipe, Japanese

chemicals and steel sheet, Taiwanese coils, or Turkish automotive tube and water

transmission pipe" was illogical.  Id. at 37–38.  By contrast, Commerce determined

that "SeAH's profit of 16.3 percent from sales of OCTG in Kuwait was almost

identical to the average [constructed value] profit of 16.2 percent (based on sales of

two OCTG producers) that Commerce used on remand in the original

investigation, which this Court sustained."  Id. at 38 n.145.  Finally, Commerce

determined SeAH's profit rate to have been a reasonable replacement for the

missing requested information because "in addition to sales of OCTG to third-

country markets, it includes both profit from OCTG dumped in the U.S. market as

well as from sales of lower-end merchandise that is outside of the same general

category of products as the subject merchandise."  Id. at 38; see also SeAH's

Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to the

Department's July 2 Supplemental Questionnaire" (Jul. 26, 2021) at Appendix SA-

5-A, PR 216–218.

         Taken as a whole, the Court concludes that the SeAH data were a reasonable

proxy to use as facts available based on Commerce's explanations and citations to

substantial record evidence.

### IV.    Dumping-Margin for Non-Examined Respondents

As stated in the <u>Remand Results</u>, "the Court remanded for further

consideration the dumping margin calculation for non-examined companies, if

Commerce recalculated the weighted-average dumping margin for Hyundai Steel,

finding that the non-examined companies were not barred from relief for failing to

exhaust administrative remedies." <u>Remand Results</u> at 2 (citations omitted); <u>see</u>

<u>Hyundai Steel</u>, 47 CIT at ___, 639 F. Supp. 3d at 1337–38.  According to the

<u>Remand Results</u>:

> Using Hyundai's recalculated margin [of 9.63 percent] to determine the
> margin applicable to non-examined companies, for these final results
> of  redetermination,  we  determine  the  weighted-average  dumping
> margin applicable to the non-examined companies which are parties to
> this litigation; those companies are AJU Besteel, Co., Ltd. (AJU
> Besteel), Husteel Co., Ltd. (Husteel), and NEXTEEL Co., Ltd.
> (NEXTEEL), the margin for which has changed from 11.70 percent to
> 6.74 percent.

<u>Remand Results</u> at 2–3.

No party commented on that redetermination.  Accordingly, the dumping

margin calculation for non-examined companies will be sustained.

### CONCLUSION

For the aforementioned reasons, the Court sustains Commerce's

determinations of Hyundai Steel's constructed export price profit, constructed

Consol. Court No. 22-00138                                        Page 35

value profit and selling expenses, constructed value profit cap, and the dumping

margin rate for non-examined respondents.

     Judgment will enter accordingly.


                                                    __/s/ Jennifer Choe-Groves__
                                                Jennifer Choe-Groves, Judge

Dated: __December 18, 2023_____
        New York, New York